**AFFIDAVIT**

I, Nicholas Horine, being duly sworn, state under oath that:

1. I am a Detective with the Kansas City, Missouri Police Department (KCMOPD) and have been employed by KCMOPD for approximately 12 years and 11 months. I have been assigned to the KCMOPD Crime Gun Intelligence Center, conducting narcotics investigations and investigations of illegal firearms possession within the city of Kansas City, Missouri. I am currently assigned as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms & Explosives. As part of my involvement in this investigation, I have worked with investigators from KCMOPD and Homeland Security Investigations.

2. From my participation in this investigation as well as from reviewing investigative reports and from discussions with other law enforcement officers, I have learned the information summarized below.

3. ATF is a federal law enforcement agency charged with the enforcement of the Federal statutes regarding firearms (Chapter 44, Title 18, United States Code) arsons and explosives (Chapter 40, Title 18, United States Code).

4. I know that it is unlawful for persons to agree, confederate, and conspire with each other to knowingly obtain a document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the Unites States, which those persons knew to be procured by means of a false claim and statement and otherwise procured by fraud and unlawfully obtained, and to knowingly make under oath and subscribe as true under penalty of perjury under Title 28, United States Code, Section 1746, a false statement with respect to a material fact in an application, affidavit, and document required by the immigration laws and regulations prescribed thereunder, and which statement the persons then and there knew as false. These actions are a violation of

Title 18, United States Code, Sections 1546 and 371. Based on the evidence summarized in this Affidavit, I believe there is probable cause to conclude that Jose Luis Morales Salgado and Oscar Gutierrez have committed the offense of conspiracy to fraudulently obtain visas.

5. This Affidavit contains information necessary to support probable cause for this application. It is not intended to include every fact or matter observed by me or known by law enforcement. The information provided is based on my personal knowledge and observation during the course of this investigation, information conveyed to me by other law enforcement officials, and my review of records, documents, and other physical evidence obtained during the investigation.

6. On 05/09/2024, Supervisors of the Kansas City Missouri Police Department (KCPD) Robbery Unit contacted detectives of the KCPD Crime Gun Intelligence Unit in regard to a robbery pattern spanning from December 29, 2021 to May 5, 2024. Robbery Supervisors identified eleven incidents in which reported robberies appeared to be connected. These cases were linked to each other, based in part, on leads generated from the National Integrated Ballistics Information Network (NIBIN). When a firearm is discharged, it leaves unique markings on the expended cartridge. NIBIN utilizes ballistic imaging technology to compare cartridge case markings and this comparative analysis can link a specific firearm to a criminal investigation. Detectives reviewed the cases with the NIBIN leads and determined there was likely one firearm used in the commission of all of the robberies. Based on the expended cartridge casings recovered at the scenes of the robberies and the NIBIN analysis, it appears that a 9x18mm pistol was utilized in the robberies.

7. Upon reviewing the cases, a pattern revealed itself. The persons who reported the robberies and claimed to be victims of the crimes were either illegally present in the United States or they

were in the United States legally through the usage of work visas and IRS tax identification numbers. The robberies were committed in areas of the city where city cameras and license plate readers were seldom present. Each incident involved the reported victims having car trouble or a situation where the victims pulled over and exited the vehicle to diagnose the car trouble or current problem. Based on the reports of the alleged victims, soon after stopping, a suspect vehicle would approach. The alleged victims generally reported that a suspect vehicle would park to the side of or in front of the victim's vehicle. The suspect would approach the victims wearing a dark hooded sweatshirt with a medical mask over his face. The suspect would assault the victims by striking them in the face or head area. The suspect would present a black firearm and take approximately $200 to $300 by force. The suspect would typically fire two rounds into the rear driver's side or passenger side door or window before leaving the area.

8. The majority of the victims would later apply for a U nonimmigrant status ("U-Visa"). Congress created the U-Visa with the passage of the Victims of Trafficking and Violence Protection Act (including the Battered Immigrant Women's Protection Act) in October 2000. The legislation was intended to strengthen the ability of law enforcement agencies to investigate and prosecute certain crimes while also protecting victims of crimes who are willing to help law enforcement authorities in the investigation or prosecution of the criminal activity. Foreign nationals can be eligible for a U-Visa if they: (1) were the victim of qualifying criminal activity that occurred in the United States or violated U.S. laws, (2) suffered substantial physical or mental abuse as a result of having been a victim of the criminal activity; (3) possessed information about the criminal activity, (4) were helpful or were likely to be helpful to law enforcement in the investigation or prosecution of the crime, and (5) were admissible to the United States. Qualifying criminal activities include, among other crimes, extortion, false imprisonment, unlawful criminal

restraint, and felonious assault. Certain qualifying family members are also eligible for derivative U-Visa status based upon their relationship to the principal filing for the U-Visa.

9. Qualifying crime victims can apply for U-Visa status by submitting a United States Citizenship and Immigration Services ("USCIS") Form I- 918, Petition for U Nonimmigrant Status; a Form I-918, Supplement B, U Nonimmigrant Status Certification; and evidence to establish each eligibility requirement.

10. The Form I-918 asks applicants if they were a victim of qualifying criminal activity, suffered substantial physical or mental abuse as a result of having been a victim of the criminal activity, and possessed information concerning the criminal activity. The Form I-918 further requires applicants to attach a personal narrative statement describing the criminal activity, along with supporting documentation. The Form I-918 further requires applicants to certify, under penalty of perjury, that all the information in their petition and any document submitted with it were complete, true, and correct.

11. The Form I-918, Supplement B required the signature of an authorized official of a certifying law enforcement agency confirming that the individual was a victim of a qualifying crime and had been or would be helpful in the investigation or prosecution of any resulting case.

12. Upon reading the U-Visa application requirements, I believe that all of the violent crime incidents in question met the criteria for the U-Visa program. Based on the reports of the aforementioned eleven robberies that appear to be connected, I have identified a total number of 33 purported victims. Of that total, I have also confirmed that eighteen (some of the staged robberies involved multiple alleged victims) of the alleged victims in have submitted Form I-918s claiming to be the victim of violent assaults in an effort to obtain U-Visas. An individual identified

as "Source #2" did report a robbery to law enforcement officials, but he/she did not submit an application for a U-Visa.

13. During the course of the investigation, initial interviews were conducted with nine of the purported victims. The victim statements were substantially similar to what the victims reported to officers on scene. Detectives gathered information from city cameras and license plate readers. They were able to identify three vehicles that were used in the robberies. These three vehicles were: A black Mazda 3 sedan, later identified as having Missouri license plate GL5P2B; a brown Chevy Tahoe, later identified as bearing Missouri license plate NK9P2M, which later changed to NL7R7L; and a brown Nissan Quest van identified as bearing Missouri license plate NK9P2M.

14. Law enforcement analysts discovered KCPD body camera footage of a traffic stop that occurred on 05/24/2024. The stop was conducted on a brown Chevy Tahoe bearing Missouri license plate NK9P2M. The driver of the vehicle was identified as Oscar Gutierrez, DOB 08/23/1989. Detectives observed the brown Nissan Quest van bearing Missouri license plate NK9P2M sitting at an auto repair shop located at Truman Ave. and Bennington Ave., Kansas City, Jackson County, Missouri. Detectives responded to the auto repair shop and were able to obtain Gutierrez's phone number from the owner of the shop. The owner had called Gutierrez to ask about the status of the payment for the Nissan Quest in the presence of detectives. Gutierrez identified himself over the phone to the shop owner and confirmed the number given by the shop owner belonged to him.

15. Detectives executed search warrants and obtained historical records for Gutierrez's phone number and his Cash App account. Through analysis of Gutierrez's historical phone records, it was determined his phone was being serviced by cell phone towers less than 1 mile away from the scenes of the robberies either just prior or directly after each incident. Cash App records revealed

Gutierrez paid rent and utilities at residence located at 537 S Hunter Street, Independence, Jackson County, Missouri, within the Western District of Missouri.

16. Two additional robbery incidents occurred on 06/21/2024 at 21st Street and Askew Avenue, Kansas City, Jackson County, Missouri, and at 12th Terrace and Jackson, Kansas City, Jackson County, Missouri, within the Western District of Missouri on July 13, 2024. Both incidents matched the *modus operandi* of the other robberies. The markings on the shell casings collected from the scenes also matched the cartridge casings recovered from the other robberies incidents discussed in this Affidavit. Accordingly, as these cartridge case markings are unique, I believe the same firearm was utilized in the reported robberies on July 13, 2024.

17. Detectives executed search warrants and obtained more updated phone records as well as timing advance data for Gutierrez's phone at the times of the most recent robberies. Timing advance data analysis showed Gutierrez's cellular phone was just north of the scene of 21st Street and Askew Avenue on 06/21/2024. Gutierrez's timing advance data for July 13th, 2024, showed Gutierrez responding to the area of the robbery and lingering in the area before going to the scene of the robbery. Timing advance data also showed Gutierrez to respond to 339 Denver Ave., Kansas City, Jackson County, Missouri following the robbery before finally coming to a stop at the aforementioned residence located at 537 S. Hunter Street.

18. Detectives initiated a pen register trap and trace on Gutierrez's phone while additional evidence was gathered. Mobile surveillance was conducted on the known associated addresses for Gutierrez. Surveillance was able to observe Gutierrez driving the aforementioned Chevy Tahoe and the Nissan Quest. Surveillance assets were also able to observe Gutierrez entering the residence located at 537 S. Hunter Street, Unit B. Detectives obtained a still image from a Valvoline Vehicle Maintenance facility at 23rd Street and Lee's Summit Road, Independence,

Jackson County, Missouri. The image was from 05/05/2024 and depicted Gutierrez driving a black Mazda 3 sedan. That image appeared to match the still images from the robbery on 05/05/2024. The image was captured by the Valvoline's security cameras approximately three hours prior to the robbery. Detectives were also able to locate a KCPD report from 2021 (KC 21-064648) where Gutierrez was stopped with a Hungarian FEG PA63 9x18mm semi-automatic pistol in his possession.

19. On 08/21/2024, at approximately 1300 hours, detectives and tactical officers executed simultaneously initiated search warrants at 339 Denver Ave. and 537 S. Hunter Street, Unit B. During the execution of the search warrants, Gutierrez was arrested and a Hungarian FEG PA63 9x18mm semi-automatic pistol was recovered from Gutierrez's brown Nissan Quest Van.

20. Gutierrez was apprised of his *Miranda* rights and agreed to be interviewed after his arrest. Gutierrez claimed responsibility for his involvement for the robberies and stated he had been doing them since 2020. He claimed possession and ownership of the recovered Hungarian FEG PA63 9x18mm semi-automatic pistol. Gutierrez also admitted that he used that firearm in the aforementioned robberies. He also revealed the purported victims would call Gutierrez's co-conspirators to arrange the robberies so they could apply for immigration help (*i.e.,* U-Visas). Gutierrez would receive a phone call from his co-conspirators who were organizing the robberies with the aliens who were paying the co-conspirators to conduct the robberies. Gutierrez indicated that the co-conspirators would provide him with instructions for the robberies to include: the date, time, location, and vehicle description. They would also discuss the number of purported victims.. Once the robberies took place and the results verified, Gutierrez would be paid from his co-conspirators for the robberies. Gutierrez reported that he would receive a sum of U.S. currency

between $200 to $1,000 per incident. Gutierrez would not divulge the identities of his co-conspirators.

21. On 08/23/2024, at approximately 0900 hours, an investigative source (hereafter referred to as Source #1) with personal knowledge of the incidents contacted detectives. Source #1 claimed he/she had information about the robberies. Source #1 responded to KCPD Headquarters and gave a statement to detectives. Source #1 stated Gutierrez was committing the robberies for his aunt, hereinafter referred to as Co-conspirator #1, and her son, Jose Luis Morales Salgado ("Jose Salgado"). The source revealed Co-conspirator #1recruits victims from her work at Smithville Sausage Factory on Tiffany Springs Road. Source #1 indicated that Co-conspirator #1 selects people who are illegally in the United States or are in possession of visas that are about to expire. Co-conspirator #1arranges the robberies with the victims and charges them $6000-$8000 for the process. Co-conspirator #1 and her son, Jose Salgado, would scout the area where the robbery would take place in advance to ensure a lack of surveillance equipment. The call would then be placed to Gutierrez and instructions would be given to him. Upon completion of the violent crime, the victims would initiate a police report and cooperate with the investigation to ensure a successful U-Visa application. Source #1 indicated Co-conspirator #1would possibly provide referrals for immigration lawyers to the victims.

22. Source #1 reported that Co-conspirator #1 and Jose Salgado had been doing this for approximately ten years. Jose Salgado would be responsible for recruitment as well as coordination and verification with Gutierrez. Source #1 indicated the number of victims who had made these arrangements was well over 100. Co-conspirator #1 had obtained her U.S. citizenship using this method and learned how to conduct her own business using this method. Source #1 revealed Co-conspirator #1 has used this business method in Mexico where Mexican citizens would apply for

asylum in the United States, claiming they had been assaulted by the Mexican drug cartels. Source #1 stated Co-conspirator #1 lives with her son, Jose Salgado, in a house near the Aldi grocery store located on Independence Ave., Kansas City, Jackson County, Missouri.

23. A review of KCPD reports revealed Co-conspirator #1 lives with Jose Salgado in a house located at 622 Newton Ave, Kansas City, Jackson County, Missouri. The residence is located less than one mile from the Aldi grocery store on Independence Ave. A review of Gutierrez's phone records revealed Co-conspirator #1 to be present on the phone records frequently within reasonable proximity to a robbery incident. Jose Salgado was discovered to be on Gutierrez's phone records as well. Jose Salgado most notably appeared on the phone records on July 13, 2024, at 2233 hours and 51 seconds, just a few minutes prior to the robbery incident at 12th Terrace and Jackson Ave, Kansas City, Jackson County, Missouri. Detectives reviewed city camera footage from the night and discovered Gutierrez's brown Chevy Tahoe driving through the area of 14th Street and Spruce Ave. At 2233 hours and 51 seconds, the Tahoe departs the 14th Street and Spruce Area and proceeds directly to the area of 12th Terrace and Jackson Ave. where the robbery occurred.

24. Law enforcement personnel began to conduct follow-up interviews with the most recent victims of the known suspicious robberies. During the course of follow-up interviews, a cooperator was developed (hereafter referred to as Source #2). Source #2 stated he/she paid $4,000 to Jose Salgado and the other conspirators to conduct a robbery so that Source #2 could attempt to obtain a U-Visa. Source #2 revealed the arrangements were made with Jose Salgado. Jose Salgado provided Source #2 directions in regard to when the robbery was to take place, time of day/night, what to wear, what vehicle Source #2 would be in, who would be with Source #2, and a story to tell the police in order to facilitate the U-Visa application process with the Kansas City Missouri Police Department. Source #2 indicated the arrangements had been made in a house near the

Elvira's bakery located on Independence Avenue, Kansas City, Jackson County, Missouri, within the Western District of Missouri. Source #2 stated they would remember the house if a photo was shown. Law enforcement personnel showed Source #2 a photo of three houses standing next to one another. Source #2 identified the house located at 622 Newton Ave. as the house the robbery and U-Visa arrangements had been made with Jose Salgado. Source #2 reported that Jose Salgado arranged the staged robbery on July 13, 2023. On July 13, 2023, a person physically struck Source #2 at a place designated by Jose Salgado. The person also took money from Source #2 and discharged a firearm. After the staged robbery, Source #2 contacted law enforcement officials and made a report that Source #2 was robbed. Source #2 later admitted to investigators that he/she knew the robbery was staged and set up by Jose Salgado. Source #2 also admitted that Jose Salgado instructed Source #2 to provide false information to investigators who were investigating the staged robbery as the police reports are material to a future application for a U-Visa.

25. An additional cooperator (hereafter referred to as Source #3) was developed during the course of a follow-up interview. Source #3 stated he/she paid Jose Salgado and the conspirators $4,000 to arrange a robbery to facilitate a U-Visa application with the KCPD. Source #3 completed a photographic lineup that contained Jose Salgado's photo. Source #3 positively identified Jose Salgado in the lineup. Source #3 indicated he/she was 100% certain the person in the photo was who he/she worked with to stage the robbery. Source #3 revealed the arrangements and the payment were finalized in a house near Independence Avenue, Kansas City, Jackson County, Missouri. Source #3 met Jose Salgado at the house and he/she indicated there was a woman present who Jose Salgado referred to as "Mama." Source #3 stated he/she would recognize the house and "Mama." Investigators showed a group photo of several parties. The photo also contained the image of Jose Salgado, and who law enforcement personnel knew as Salgado's mother, Co-

conspirator #1. Source #3 identified Co-conspirator #1 as the woman Jose Salgado referred to as "Mama" and he/she indicated a 100% confidence level. Source #3 was shown a photo of three houses standing next to one another. The photo contained the image of the residence at 622 Newton Ave. Source #3 identified 622 Newton Ave as the house where the arrangements were made. Source #3 further inspected the photo and identified the dog standing in front of 622 Newton Ave as the dog that was present while the arrangements were being made. Source #3 went on to indicate that Co-conspirator #1 was involved with the planning and payment phase of the incident. Source #3 stated that Co-conspirator #1 confirmed everything Jose Salgado was saying as true and was the main person who would encourage the conversation to progress until the plans were finalized and the payment was made in U.S. currency.

26. On 12/23/2024, at approximately 1200 hours, mobile surveillance crews observed Jose Salgado standing the front doorway of the residence located at 622 Newton Ave. Surveillance crews observed the door open with Jose Salgado standing halfway out of the residence. Observing Jose Salgado confirmed his presence and nexus to the residence.

27. On 01/10/2025, at approximately 0927 hours, Source #2 attempted to contact Jose Salgado, through his Facebook Messenger account in an attempt to start a conversation to facilitate an undercover operation. Jose Salgado did not immediately respond, but according to Facebook Messenger Jose Salgado read the sent messages a few hours after they were sent. On 01/13/2025, Source #2 attempted to make contact with Jose Salgado again which yielded negative results.

28. On 01/14/2025, Source #2 made contact with a person hereinafter referred to as Co-conspiratory #5. Source #2 had indicated previously that Co-conspiratory #5 had been the party who recruited Source #2 for the process of fraudulently obtaining a U-Visa. Source #2 reported that Co-conspirator #5 put Source #2 in contact with Jose Salgado. Source #2 asked Co-conspirator

#5 about Jose Salgado and indicated Source #2's interest in obtaining a U-Visa process again. Co-Conspirator #5 stated Salgado is still arranging things with the U-Visa process. Co-conspiratory #5 stated he/she would contact Jose Salgado and let him know Source #2 is trying to contact him. On 01/14/2025, at approximately 1830 hours, Source #2 received a phone call from Jose Salgado from his/her Facebook Messenger account. Jose Salgado attempted to set up a meeting for the night of 01/14/2025. Source #2 declined to meet at that time and Jose Salgado asked for a meeting on 01/15/2025. He provided the address of 622 Newton Ave, Kansas City, Jackson County, Missouri and stated that the meeting would be at that location.

29. On 01/22/2025, at approximately 1800 hours, an undercover operation was conducted at the residence located at 622 Newton Ave, Kansas City, Jackson County, Missouri, within the Western District of Missouri. A federal undercover agent (hereafter referred to as "UC") and Source #2 conducted the operation. The UC is a fluent speaker of the Spanish language. Jose Salgado set up a meeting and provided the meet location as his address located at 622 Newton Ave., Kansas City, Jackson County, Missouri. Upon arrival of the UC and Source #2, Jose Salgado exited his residence and got into the vehicle where the UC and Source #2 were waiting. Jose Salgado instructed the UC to drive down the street away from the residence. The UC drove the vehicle a short distance away from the residence and engaged in conversation with Jose Salgado. This meeting was recorded with clandestine recording devices.

30. Jose Salgado related how he had "helped" a "female friend" in a prior incident and the "female friend" had received her permit on the 20th, stating "she paid it all in cash and received it," referring to a U-Visa. The conversation continued and Jose Salgado began discussing pricing details for the deal. Salgado stated, "the fee increased to four per person." The UC asked for clarification and Jose Salgado stated, "Four.....Four and three zeros." This conversation was

spoken in Spanish and the quotes in this Affidavit are a good-faith translation of the Spanish communications between Jose Salgado, the UC and Source #2. Jose Salgado was asked for clarification when the UC asked: "4,000?" Jose Salgado replied, "yes." Jose Salgado requested money upfront because Jose Salgado indicated that he would need to purchase phones with "chips" so communications were possible and he would carry one of the phones with him.

31. Jose Salgado then stated: "I could lose everything I have, you understand? That's why I need to know what's up." Jose Salgado spoke of another "male friend" who wanted to go through the process of being assaulted as part of a scheme to fraudulently obtain a U-Visa. The UC explained to Jose Salgado that the UC had half of the money. Jose Salgado indicated if the UC wanted to leave the money the UC could, because Jose Salgado needed to "get mobilized." Jose Salgado mentioned needing to get phones with "chips." The UC asked Jose Salgado if a phone would be provided to the UC. Jose Salgado stated "no" and explained he needed to have the phone and didn't want anything to be registered and he would need to purchase ammunition to conduct the robbery.

32. The UC asked for more clarification on what would happen. Jose Salgado stated he was going to look for a spot similar to where they were currently sitting and the UC could say "she got jammed and could not get out." Salgado indicated the vehicle the UC brought to the scenario would have to be shot up. The UC asked if Jose Salgado intended to shoot up the UC's vehicle. Salgado responded, "Yes, one more shot. It has to be that forcibly. It could be in the door and not the glass." Jose Salgado indicated he wanted to shoot the glass and it would be small and inexpensive. Salgado stated, "the evidence of the bullet needs to be in your car so they can give you that benefit." Jose Salgado referred to the weather (the weather had been cold with recent snow) and mentioned it was good because the UC could get his/her car "jammed" and the UC could say he/she was

"assaulted" while he/she was stuck. Jose Salgado stated, "in this situation we are going to call a tow truck. Do you understand? So that it's realistic. But tow trucks take forever to arrive."

33. The UC verified the plan was for the UC to be driving around in an area Jose Salgado dictated, and the UC would get stuck. Jose Salgado responded, "yes, they assaulted you." Jose Salgado revealed the UC would have to be slapped hard as well. Jose Salgado indicated it would not be him slapping the UC but stated, "they needed to, it didn't have to be that hard but it is necessary." Based on my training, experience and knowledge of this investigation, I believe Jose Salgado was informing the UC that the assault had to be aggressive to persuade local law enforcement officials that it was a real crime so that the UC could successfully obtain a U-Visa on false pretenses, namely that the assault was genuine rather than a fraudulent one.

34. The UC asked if the people doing it were trustworthy. Jose Salgado stated, they were trustworthy and only one person would be doing it and stated: "It's worth it." Jose Salgado went on to dictate details about where the UC would meet with Jose Salgado on the day of and he would give his/her details on what to say and everything else. Jose Salgado stated he would be watching the incident from afar and he would, "set the guy loose, the guy who is to put on the grand show." Salgado revealed the "guy" would say nothing if he were to be caught and he is supposed to be, "a thief, a drug addict who wants his drugs, he assaulted you and it's over. There's always a chance for him to flee, but in case he gets caught, he knows what to say." Based on my training, experience and knowledge of this investigation, Jose Salgado's admission that his co-conspirator was going to "put on a grand show" revealed that Jose Salgado was orchestrating a fake assault for the purpose of assisting the UC in fraudulently obtaining a U-Visa.

35. Jose Salgado told the UC, he would train his/her on what to do and say to law enforcement officials. He indicated that the UC would have to call the police afterwards. Jose Salgado

mentioned he had another "friend" who was going to do it on the 24th but they cancelled it. Jose Salgado stated he would not "let go" of the UC's money until he verifies from far away that the deal has been done, and there would be another "friend" watching too. Salgado stated they would have to meet somewhere away from his residence on the day of the fake assault because Jose Salgado's "mother" doesn't want him helping people with this anymore because he could, "lose his papers and it's risky." Based on my training, experience, and knowledge of this investigation, I believe that Jose Salgado was indicating that his mother was concerned that he may get deported if he engages in such criminal activity. Once the plans were agreed upon, the UC paid Salgado $500 in U.S. currency. Salgado accepted the U.S. currency and exited the vehicle, walking back to his residence at 622 Newton Ave, Kansas City, Jackson County, Missouri.

36. I have reviewed that the U-Visa applications from aliens who purportedly were victims of robberies in this case. In total, eighteen aliens submitted completed Forms I-918, Schedule B to USCIS predicated upon their false claims to law enforcement officials that they were victims of genuine robberies when in fact these robberies were staged.

37. Based on my knowledge of this investigation, below is a list of some of the overt acts that were used by members of this conspiracy to further the conspiracy to fraudulently obtain U-Visas and to make false material statements on immigration documents submitted to USCIS.

a. On or about December 29, 2021, co-conspirators, organized and executed a staged robbery at East 27th Street and Chelsea Avenue, Kansas City, Missouri.

b. On or about December 17, 2022, co-conspirators organized and executed a staged robbery at 106 N. Lawndale Avenue, Kansas City, Missouri 64123.

c. On or about April 2, 2023, co-conspirators organized and executed a staged robbery at 1111 Winchester Avenue, Kansas City, Missouri.

d. On or about August 8, 2023, co-conspirators organized and executed a staged robbery at East 7th Street and Beacon Avenue, Kansas City, Missouri.

e. On or about September 7, 2023, co-conspirators organized and executed a staged robbery at East 14th Street and Bales Avenue, Kansas City, Missouri.

f. On or about October 13, 2023, co-conspirators organized and executed a staged robbery at 1130 Elmwood Avenue, Kansas City, Missouri.

g. On or about January 20, 2024, co-conspirators organized and executed a staged robbery at East 10th Street & Winner Road, Kansas City, Missouri.

h. On or about March 23, 2024, co-conspirators organized and executed a staged robbery at East 14th Street & Spruce Avenue, Kansas City, Missouri.

i. On or about May 5, 2024, co-conspirators organized and executed a staged robbery at East 7th Street and Jackson Avenue, Kansas City, Missouri.

j. On or about June 23, 2024, co-conspirators organized and executed a staged robbery at East 21st Street and Askew Avenue, Kansas City, Missouri.

k. On or about July 13, 2024, co-conspirators organized and executed a staged robbery at East 12th Terrace & Jackson Avenue, Kansas City, Missouri.

l. On or about July 13, 2024, co-conspirators organized and executed a staged robbery at East 12th Terrace & Jackson Avenue, Kansas City, Missouri.

m. On or about August 8, 2023, an individual identified as Co-Conspirator #5 falsely claimed to a law enforcement officer that he/she was the victim of a robbery on August 8, 2023.

n. On or about March 19, 2024, Co-Conspirator #5 caused to be submitted an application for a U-Visa.

o. On or about March 19, 2024, Co-Conspirator #5 executed an affidavit in support of an application for a U-Visa, falsely claiming that he/she was the victim of a robbery on August 8, 2023.

p. On or about July 13, 2023, an individual identified as Source #2 falsely claimed to a law enforcement officer that he/she was the victim of a robbery on July 13, 2023.

q. On or about June 23, 2024, an individual identified as Source #3 falsely claimed to a law enforcement officer that he/she was the victim of a robbery on June 23, 2024.

r. On or about July 21, 2024, Source #3 executed an affidavit in support of an application for a U-Visa falsely claiming that he/she was the victim of the June 21, 2024 robbery.

r. On or about July 24, 2024, Source #3 caused to be submitted an application for a U-Visa.

38. It should be noted the aforementioned conversation was recorded by the UC and the spoken language was Spanish. The UC translated the aforementioned conversation and provided it as evidence.

39. Immigration records checks performed by Special Agents from Homeland Security Investigations revealed Jose Salgado is not a United States citizen or national and he is illegally residing in the United States. Immigration records also confirmed that Oscar Gutierrez is also not a United States citizen or national and he too is illegally present in the United States.

40. Based on my training, experience, and knowledge of this investigation, I believe that facts contained in this Affidavit establish probable cause to believe that Jose Luis Morales Salgado,

Oscar Gutierrez and others agreed and conspired with each other to assist aliens in fraudulently obtaining visas and documents used for authorized stay or employment in the United States and I further believe they agreed to assist these aliens in making false statements with respect to a material facts in an applications, affidavits, and documents required by the immigration laws and regulations prescribed thereunder, and which statements the persons then and there knew as false. These actions are a violation of Title 18, United States Code, Sections 1546 and 371.

FURTHER AFFIANT SAYETH NAUGHT.

Nicholas Horine
KCMO/PD Detective, CGIC
ATF Task Force Officer, Group KC VII

Subscribed and sworn to ~~before me~~ this 30th day of January, 2025.

By telephone at 2:54 pm, signature confirmed

HONORABLE W. BRIAN GADDY
United States Magistrate Judge
Western District of Missouri